

**THOMAS J. CATLIOTA**
**U.S. BANKRUPTCY JUDGE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### at Greenbelt

| | | |
|---|---|---|
| In re: | * | Case No.   15-23570-TJC |
| Peter Romero | * | Chapter   7 |
| Debtor | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

### MEMORANDUM OF DECISION

Before the court is a motion to dismiss the bankruptcy case of the debtor Peter Romero filed by Ralph S. Janvey, in his capacity as a court-appointed receiver for the Stanford International Bank Ltd. (the "Receiver"). ECF 91. The debtor opposes the motion. ECF 105. For the reasons in this Memorandum, the court will deny the motion.

The court has jurisdiction over this matter under 28 U.S.C. §§1334 and 157(a) and Local Rule 402 of the United States District Court of the District of Maryland. This is a core proceeding that the court may hear and determine pursuant to 28 U.S.C. §157(b).

### Findings of Fact

The debtor filed a petition for relief under Chapter 7 on September 30, 2015. Monique Almy was initially appointed as interim trustee and serves as the Chapter 7 trustee in the case.

***The Debtor's Background and the Receiver's Judgment.***

The debtor began working for the United States Department of State in 1977. Over the ensuing 24 years, he rose to become an Ambassador and the Assistant Secretary of State for Western Hemisphere Affairs. There is no dispute he received numerous awards and otherwise had an exemplary career.

He retired from foreign service in 2001 and worked for a time in investment banking. He then formed a consulting company to assist clients with mitigating or avoiding overseas problems and consulting on foreign relations matters. He also served on a number of boards of nonprofit organizations on a pro bono basis. For approximately seven years he worked as a consultant for Stanford Financial Group ("Stanford"). He advised Stanford on overseas markets and political risk and stability, gave speeches on U.S. policy, and provided them with investment opportunities. He severed ties with Stanford the day he learned of the Receiver's appointment and that fraud activities had occurred.

The Receiver brought suit against the debtor in the U.S. District Court for the Northern District of Texas. The debtor's relationship with Stanford, the Receiver's claims against the debtor, and the judgment obtained by the Receiver were described by the Fifth Circuit Court of Appeals as follows:

> For almost twenty years, R. Allen Stanford [] and his co-conspirators perpetrated a multi-billion dollar Ponzi scheme. The Ponzi scheme involved a network of numerous entities owned by Stanford [] that sold fraudulent certificates of deposit ("CDs") to investors.
>
> After [the debtor] retired from the United States Department of State in 2001, he began working part-time as a member of the Stanford International Advisory Board (the "IAB"). Although the nature of [the debtor's] job functions are disputed, there is evidence to support that his job essentially was to market the Stanford brand internationally. He worked on the IAB for almost eight years, resigning in January 2009. He received $700,000 as advisory board fees for his work on the IAB, distributed in periodic

2

installments over the span of these eight years, plus travel expense reimbursement and payments on his own Stanford CDs.

On February 16, 2009, the Securities and Exchange Commission filed a lawsuit against Stanford, Stanford's Chief Financial Officer James M. Davis ("Davis"), various other individuals, and various Stanford entities. That same day, the court appointed Ralph S. Janvey to be the Receiver for those defendants. On August 27, 2009, Davis pled guilty to criminal charges. In October 2010, the Receiver began investigating payments made to the members of the IAB, including [the debtor]. On February 15, 2011, which was approximately four and a half months after the Receiver began investigating the IAB, the Receiver filed the underlying lawsuit against [the debtor].

In the underlying lawsuit, the Receiver sought to recover the monies paid by the Stanford entities to [the debtor] under a fraudulent transfer claim or, alternatively, an unjust enrichment claim. After a four-day jury trial in February 2015, the jury found in favor of the Receiver on both the fraudulent transfer and unjust enrichment claims. [The debtor] then filed a motion for judgment as a matter of law, alleging that a portion of the fraudulent transfer claim is barred by the statute of repose and that unjust enrichment is not an independent cause of action. The district court denied [the debtor's] motion and entered a final judgment awarding the Receiver $788,655.01 in damages under the fraudulent transfer claim only; no damages were awarded under the alternative unjust enrichment claim.

*Janvey v. Romero*, 817 F.3d 184, 186-187 (5th Cir. 2016).

The judgment included damages of (1) $700,000 in fees paid for the debtor's service on the IAB, (2) $55,000 in expense reimbursement, and (3) $3,018.37 in CD interest payments, but not the return of principal. *Id.* The Receiver then sought attorneys' fees and costs of $941,356.19 and was awarded $320,000. Receiver's Exhibit ("Rec. Ex.") 2 at 1 of 9. With prejudgment interest, the judgment stands at $1.275 million. The judgment was affirmed by the Fifth Circuit Court of Appeals. *Janvey*, 817 F.3d at 192.

After the judgment was entered, the debtor attempted to negotiate a settlement with the Receiver. He submitted a letter and attachments dated May 19, 2015, that listed his exempt and nonexempt assets. Debtor's Exhibit ("Deb. Ex.") A. The Receiver rejected the settlement proposal, stating "[p]ursuing the Ambassador has strategic importance beyond the amount of

money involved.  Trial counsel never understood that.  Perhaps you can see that . . . ."  Deb. Ex. B at 1 of 2.

The debtor's Individual Retirement Accounts ("IRAs") are administered by Wells Fargo Bank through an office in Maryland.  The Receiver attempted to garnish the debtor's IRA by filing a garnishment on Wells Fargo in California.  The debtor holds no assets in California and has no other connections with the state.  The debtor contends that the Receiver selected California because its laws are the most favorable to a creditor seeking to collect a debt from pension funds.  The Receiver neither accepted nor disputed this contention.  The debtor was required to retain California counsel to challenge the Receiver's garnishment.

The debtor again attempted to negotiate a settlement with the Receiver after he filed the petition and was again unsuccessful.

***The Debtor's Financial Condition.***

The debtor and his wife purchased their residence in 1996 for $388,000 as tenants by the entireties.  The home is waterfront property in St. Michaels, Maryland. According to their schedules, the property is worth approximately $1.48 million today, and is encumbered by a deed of trust loan of just under $400,000.  Rec. Ex. 6 at 3 of 31.

The debtor and his wife own two investment real estate properties as tenants by the entireties.  One is located on Water Place in Alexandria, Virginia.  According to the debtor's schedules it has a value of $815,000 and is encumbered by a deed of trust of $162,946.  *Id*.  The second is located on 22nd Street in Washington, D.C.  The debtor lists the value at $525,000, and it is unencumbered.  *Id*.

The debtor holds two IRAs administered by Wells Fargo in the total amount of $700,000. *Id*. at 5 of 31.  His interest in the Peter F. Romero Defined Benefit Plan is valued at $1.5 million. *Id.*

On his Schedule C, the debtor claimed an exemption for the real estate because it is owned tenants by the entireties, and claimed an exemption for his interest in the IRAs, the defined benefit plan, and the State Department pension.  Rec. Ex. 6 (Schedule C) at 8 of 13; Rec. Ex. 7 (Amended Schedule C) at 1 of 2.

The debtor's Schedule F lists the Receiver's claim of $1,275,976.61.  In addition, the schedule lists a claim of $54,296.28 to the law firm of Kane Russell Coleman and Logan, and $92,000 to the law firm of Squire Patton and Boggs.[1]

As of the petition date, the debtor owned a 1987 Mercedes Benz, which he valued on Schedule B at $15,000, a 25-foot Seaquest boat, valued on Schedule B at $20,000, and a 43-foot Chris Craft boat, valued on Schedule B at $200,000.  The debtor acquired the Chris Craft boat for $238,500 primarily with an inheritance from his father's estate, and the boat was titled as tenants by the entireties.  Rather than fight a challenge to the exemption, and as a show of good faith, the debtor did not pursue the tenants by the entireties exemption for the Chris Craft boat and surrendered it to the Chapter 7 trustee for administration.  *Compare* Rec. Ex. 6 (Schedule C) at 8 of 13 *with* Rec. Ex. 7 at 1 of 2.  The Chapter 7 trustee sold the Mercedes for $5,900 (ECF 82), the Seaquest for $13,000 (ECF 87), and the Chris Craft for $150,000 (ECF 109).

---

[1] The debtor also lists a handful of joint credit card debt with his wife.  The credit cards were primarily in his wife's name and he was an authorized user.  The debtor's wife paid the credit card debt after the case was filed because she did not want to lose the credit cards.  The debtor filed an amended Schedule F that shows the debts were paid.  The debtor has no credit cards solely in his name.

***The Debtor's Wife's Illness.***

The debtor is married to Ruth Espey-Romero.  She is an attorney and was a partner with the law firm of Greenberg and Traurig, specializing in international law.  She contracted a bacterial brain infection while serving as chairman of a nonprofit organization in Colombia.  As a result she is 100% incapacitated for work and has impaired motor skills, balance and eyesight.

The debtor and his wife remodeled the house to allow her to maintain living arrangements on the first floor.  Prior to the bankruptcy filing, the Romeros employed a live-in caregiver to tend to Ms. Espey-Romero.  They subsequently reduced that to a daily home caregiver, except for Sundays and part of Saturdays when the debtor manages his wife's care on his own.

***The Household Income.***

The debtor's State Department pension plan generates $4,371 per month.  He and his wife receive approximately $3,000 in monthly net rental income from the two investment properties, and $4,633 per month in social security income.  His wife held three disability insurance policies that generated approximately $22,000 per month.  However the SunLife policy that paid $11,000 monthly essentially ceased in October 2015[2], and the UNUM policy that paid $6,100 monthly ceased in February 2016.  Because of the decrease in his wife's disability payments, the debtor began taking $11,000 monthly from his IRA in January 2016.

The primary household expenses are the debtor's wife's medical expenses, which average $12,000 per month.  The majority of these have been covered by Ms. Espey-Romero's three disability policies.  Even with the three policies, the debtor and his wife were "out-of-pocket"

---

[2] A *de mininis* final payment of several hundred dollars was made in November 2015.

about $55,000 in 2014 for medical expenses.  Rec. Ex. 4, at Romero00004 (2014 Tax Schedule A).[3]

The debtor scheduled $1,000 per month for entertainment expenses, but the great majority of this expense was for docking and insurance on the Chris Craft boat, which has now been sold by the trustee.  The debtor agreed with the trustee that he would continue to pay the monthly docking fee and insurance for the Chris Craft until it could be sold, thus saving the estate those expenses.  Prior to the petition the debtor paid for the live-in caretaker for his wife.  The caretaker and her daughter lived at the residence, which increased the household expenses for food and incidentals.  This expense was reduced when the debtor and his wife switched to daily, rather than live-in, care for his wife.

### *Bankruptcy Case Administration*.

The debtor filed the Chapter 7 petition on September 30, 2015.  The Receiver filed the motion to dismiss on April 5, 2016, and the hearing on the motion was held on June 3, 2016.  During this time, a considerable amount of case administration occurred.

The debtor timely filed his schedules and statement of financial affairs, although he filed amended schedules.  He produced documents to the Receiver and was examined in response to a Fed. R. Bankr. P. 2004 request without incident.  The debtor surrendered his non-exempt assets to the trustee for sale as described above.

The deadlines to object to the debtor's exemptions, object to his discharge, or seek to except a debt from discharge were extended to April 5, 2016.  Neither the Receiver nor anyone else challenged the debtor's exemptions or sought to except his debt from dischargeability or deny the debtor a discharge.

---

[3] The trial transcript states that the debtor was out-of-pocket "$5,500."  Transcript, ECF 130 at 17.  However, the debtor's actual testimony was that the amount was $55,000 and that amount is supported by Schedule A of the debtor's tax return as he testified.  *Id.*

## Conclusions of Law

The Receiver seeks dismissal under 11 U.S.C. §707(a) based on the debtor's alleged bad faith in filing the petition. Section 707(a) provides a "court may dismiss a case . . . only after notice and a hearing and only for cause . . . ." 11 U.S.C. §707(a). This section contains three stated grounds for dismissal, none of which is applicable here, but the three grounds are illustrative only and are not exclusive in determining whether "cause" exists for dismissal. *In re Piazza*, 719 F.3d 1253, 1261 (11th Cir. 2013).

Courts are split on whether bad faith can constitute "cause" for dismissal of a Chapter 7 case. The Ninth Circuit has concluded that "bad faith as a general proposition does not provide 'cause' to dismiss a Chapter 7 petition under §707(a)." *In re Padilla*, 222 F.3d 1184, 1191 (9th Cir. 2000). The Eighth Circuit has adopted a "narrow, cautious" approach to bad faith dismissals. *In re Huckfeldt*, 39 F.3d 829, 832 (8th Cir. 1994). It requires "extreme misconduct falling outside the purview of more specific Code provisions." *Id.* (agreeing with the approach adopted in *In re Kahn*, 172 B.R. 613, 624-626 (Bankr. D. Minn. 1994)).

A number of other circuit courts have recognized that bad faith can be a basis to dismiss a case under §707(a). *See, e.g.*, *In re Krueger*, 812 F.3d 365, 370 (5th Cir. 2016) (stating that broadly reading "cause" to encompass bad faith "is no more than acknowledgement in the [C]hapter 7 context of what has long been recognized: Every bankruptcy statute since 1898 has incorporated literally, or by judicial interpretation, a standard of good faith for the commencement, prosecution, and confirmation of bankruptcy proceedings." (internal citation and quotation marks omitted); *In re Schwartz*, 799 F.3d 760, 764 (7th Cir. 2015) (applying §707(a) to find that "unjustified refusal to pay one's debts is a valid ground" for dismissal); *In re Tamecki*, 229 F.3d 205, 207 (3d Cir. 2000) ("Section 707(a) allows a bankruptcy court to dismiss

a petition for cause if the petitioner fails to demonstrate his good faith in filing."); *In re Zick*, 931 F.2d 1124, 1127 (6th Cir. 1991) ("[L]ack of good faith is a valid basis of decision in a 'for cause' dismissal by a bankruptcy court."); *Piazza*, 719 F.3d at 1262 (concluding that "cause" under 707(a) includes prepetition bad faith).

The Fourth Circuit has not addressed the issue, but it has recognized a good-faith requirement for filing a petition under Chapter 11. *Carolin Corp. v. Miller*, 886 F.2d 693, 698−700 (4th Cir. 1989) ("[A]n implicit prerequisite to the right to file [a Chapter 11 petition] is 'good faith' on the part of the debtor, the absence of which may constitute cause for dismissal." (internal citation and quotation omitted). Lower courts within this Circuit have regularly held that cause exists under §707(a) to dismiss a petition that is filed in bad faith. *See, e.g.*, *In re Wilson*, No. 12–32715–WIL, 2016 WL 1254637, at *5 (Bankr. D. Md. Mar. 30, 2016); *In re Watson*, No. 10-1292, 2010 WL 4497477, at *4 (Bankr. N.D.W. Va. Nov. 1, 2010); *In re Gilman*, No. 11-06036-8-SWH, 2012 WL 1230276, at *2 (Bankr. E.D.N.C. Apr. 12, 2012); *McDow v. Smith*, 295 B.R. 69, 78 (Bankr. E.D. Va. 2003).

The court agrees that bad faith can constitute "cause" for dismissal under §707(a). *Wilson*, 2016 WL 1254637, at *5. Bad faith is found where the debtor's acts or omissions "constitute a misuse or abuse of the provisions, purpose or spirit of the bankruptcy law." *McDow*, 295 B.R. at 74. In determining whether bad faith exists, courts apply a totality of the circumstances approach and have identified a number of factors to consider in determining whether bad faith exists. *See e.g. In re Baird* 234 B.R. 546, 550-51 (Bankr. M.D. Fla. 2010); *McDow*, 295 B.R. at 79 n.22. Ultimately, however, "[t]he facts required to mandate dismissal based upon a lack of good faith are as varied as the number of cases." *Zick*, 931 F.2d at 1127 (citing *In re Bingham*, 68 B.R. at 935).

The *McDow* court identified the following factors taken from various cases to aid in the analysis:

(1) The debtor's concealment or misrepresentation of assets and/or sources of income, such as the improper or unexplained transfers of assets prior to filing;

(2) The debtor's lack of candor and completeness in his statements and schedules, such as the inflation of his expenses to disguise his financial well-being;

(3) The debtor has sufficient resources to repay his debts, and leads a lavish lifestyle, continuing to have excessive and continued expenditures;

(4) The debtor's motivation in filing is to avoid a large single debt incurred through conduct akin to fraud, misconduct, or gross negligence, such as a judgment in pending litigation, or a collection action;

(5) The debtor's petition is part of a "deliberate and persistent pattern" of evading a single creditor;

(6) The debtor is "overutilizing the protection of the Code" to the detriment to his creditors;

(7) The debtor reduced his creditors to a single creditor prior to filing the petition;

(8) The debtor's lack of attempt to repay creditors;

(9) The debtor's payment of debts to insider creditors;

(10) The debtor's "procedural gymnastics" that have the effect of frustrating creditors;

(11) The unfairness of the debtor's use of the bankruptcy process.

*McDow*, 295 B.R.at 79 n.22.  The court will address each factor in turn.

**(1)    Concealment or Misrepresentation of Assets or Income**

The debtor has not concealed or misrepresented any assets or sources of income.  He made no transfers before the bankruptcy filing or during the litigation with the Receiver.  He disclosed his assets to the Receiver on two occasions after the judgment was entered in an effort to resolve the matter.  He provided full and complete responses to the Receiver's post-judgment

interrogatories and document requests in June 2015.  The debtor and his wife also provided various documents concerning her finances as well.  Neither the Receiver nor anyone else has alleged these disclosures were not complete and accurate.

The debtor did not object to the Receiver's request for a Rule 2004 exam after the petition was filed.  He produced the requested documents without any dispute as far as the record shows, and appeared at the examination and answered all questions without controversy.  The Receiver has not alleged that the debtor's document production and his Rule 2004 testimony were not accurate and complete.  While this behavior is expected of a debtor, it provides no suggestion of bad faith.

### (2)    Lack of Candor and Completeness of Schedules

The debtor testified he was instructed to complete his schedules as accurately as possible, and the court finds that he did so.  His schedules and statement of financial affairs were accurate, complete, and timely.  The Receiver points to two items on the debtor's schedules that suggest the debtor was not completely candid, but neither item supports that contention.  First, a disability insurance payment from Sun Life to the debtor's wife was scheduled to terminate after the October 2015 payment (*i.e.*, the month after the debtor filed the petition).  On his Schedule I, the debtor did not include the October payment in the list of monthly income because the payment was set to terminate.  However, the debtor expressly stated on the face of Schedule I:

> For the month of October, Debtor's wife will receive an additional $11,041.63 from Sun Life disability policy. This is the last payment she will receive. Income shown does not include this amount [because the] figures reflect what the Debtor and his wife will be receiving on a go forward basis.

ECF 14 at 17 of 31.  No lack of candor can be attributed to the debtor in light of this express disclosure.

The Receiver also alleges that the debtor understated monthly rental income from two investment properties by a total of $300.  However, the evidence established that the debtor listed the correct rental income at the time he filed the schedules, and that the modest increases in monthly rental income resulted from leases entered into after the schedules were filed.  The debtor's schedules do not support the claim that he is acting in bad faith.

### (3)     Unreasonable and Excessive Use of Resources

The debtor has substantial resources, but mostly they are exempt.  The exemptions are of two types.  First, the debtor owns three valuable parcels of real properties with his wife as tenants by the entireties.  By all accounts, the real estate assets were titled as tenants by the entireties from the date of their acquisition, and the debtor and his wife acquired them over a period of years in the ordinary course.  These assets have equity of approximately $2 million, but they are not available to satisfy the Receiver's judgment because the debtor is solely obligated on the judgment.  The disposition of these assets is not left to the debtor alone.  Second, the debtor has sizable pension assets.  Nothing in the record suggests the exemptions are not bona fide, or that the debtor converted nonexempt assets to exempt status to protect them from the reach of creditors.  He claimed these as exempt on his Schedule C and no party objected.

The debtor has cooperated with the trustee and turned over all nonexempt assets.  The trustee sold the debtor's car and his 25-foot SeaQuest boat.  The debtor and his wife agreed to withdraw the exemption for the Chris Craft boat, and turned it over to the trustee for sale.  The debtor also agreed to pay the docking fee and insurance on the boat until it was sold, thus saving the estate a considerable amount of expense.  These facts support the conclusion that the debtor has acted in good faith.

There is no evidence before the court that, since the Receiver began pursuing him, the debtor has spent or diminished his nonexempt assets. The debtor lives a comfortable, but not exorbitant, lifestyle. Perhaps his primary discretionary expense is eating out at restaurants. He belongs to no country clubs or social clubs. He scheduled $1,000 per month on line 13 on his Schedule J for entertainment expenses, but the great majority of this expense was for docking and insurance on the Chris Craft, which has now been sold by the trustee. His Mercedes Benz was a 1987 model, and he leased a Ford Escape before he gave up the lease during the case. The debtor occasionally visits his son and brother, who live in Colorado, and in the wintertime, takes his wife to visit his mother and sister who live in Florida. He has had one vacation "throughout all of this"–which the court takes to mean the five-year litigation with the Receiver and his wife's illness–when they went to Italy to celebrate a friend's 60th birthday.

### (4)    Improper Motivation in Filing Bankruptcy

The debtor's primary motivation in filing the petition was to address the Receiver's judgment. But the point is more nuanced than that. The debtor tried unsuccessfully to settle with the Receiver, but found that the Receiver's pursuit of him had "strategic importance beyond the amount of money involved." Deb. Ex. B at 2 of 2. The debtor contends that the "strategic importance [of his case] beyond the amount of money involved" is that the Receiver has similar claims against others and the resolution of this matter could impact the settlements of those actions. As the debtor describes it:

> if the Receiver could publicly inflict serious financial harm on [the debtor], and demonstrate to the outside world that 'scorched earth' litigation would be utilized in his cases against those who resisted or defended claims, he could use those tactics to force and leverage settlements with the numerous remaining avoidance action defendants.

ECF 105 at 4 of 27. The Receiver did not offer a different explanation of the "strategic importance" of the debtor's case. The debtor also faced aggressive litigation tactics by the

Receiver in the form of a challenge to his exemption in California, a state where he has no connections.  The debtor paid $700,000 in legal fees in the Receiver litigation and owed $150,000 more in fees.  It was clear the dispute with the Receiver was not going to be resolved through a consensual resolution and would continue to be costly and time-consuming.

The debtor found it impossible to obtain work because of the judgment.  On top of this, the debtor's wife's illness incapacitated her and required twenty-four hour live-in care, although that has since been reduced to daily care.  Two of her three insurance payments were scheduled to cease, one in October 2015, and one in February 2016.  Even with substantial insurance, the debtor and his spouse were "out-of-pocket" $55,000 in medical expenses in the year prior to the filing.  With the termination of the two policies, the out-of-pocket medical expenses are likely to increase.

In sum, prior to filing bankruptcy, the debtor faced the inability to earn a living, his wife's illness and care needs, the pending termination of two disability policies, and aggressive and costly litigation tactics by the Receiver, who seemed intent on challenging the debtor's exemptions, with apparently no consensual resolution available.  He filed the petition so that any challenge to his exemptions or the dischargeability of the judgment could be addressed in one court.  Under these circumstances, the significance of the Receiver's judgment to the debtor's filing is not a determinative factor.

(5)    **Deliberate and Persistent Pattern in Avoiding Creditor**

There is no evidence before the court that the filing is part of "deliberate and persistent pattern" of evading the Receiver's judgment.  Other than filing the petition, the only legal actions the debtor has taken is to dispute the Receiver's claims at trial and exhaust his appeals of the judgment, which do not raise an inference of bad faith.  His disclosures of assets to the Receiver,

both voluntarily and in response to post-judgment discovery requests, his attempt to reach a resolution, and the lack of any transfers of assets or post-judgment maneuvers all run contrary to the notion of a "deliberate and persistent pattern" to evade the judgment.

      **(6)**      **Overutilization of the Code**

For the reasons stated in the other factors, the debtor is not "overutilizing the protection of the Code."

      **(7)**      **Reduction to Single Creditor**

The debtor did not reduce his creditors to a single creditor prior to the filing of the petition. The Receiver is his primary creditor, but he also owes more than $150,000 to two law firms. There is no indication he "reduced his creditors" to a single creditor except to the extent he paid his ordinary household expenses and a large portion of his legal fees in the ordinary course as they were incurred.

      **(8)**      **Apathy Toward Repayment of Creditors**

The debtor made good faith efforts to reach a resolution with the Receiver at least twice. He provided a schedule of all exempt and nonexempt assets prior to and after the petition in an effort to do so. However, his efforts did not result in a settlement. As stated above, at least one of the reasons the parties did not reach a resolution was that "[p]ursuing the Ambassador has strategic importance [to the Receiver] beyond the amount of money involved." Deb. Ex. B at 2 of 2. As the saying goes, "it takes two to tango," and the failure of the matter to settle can hardly be blamed solely on the debtor. The debtor's pre-petition disclosure to the Receiver of his assets, and his efforts to settle are evidence of his good faith.

**(9)    Repayment of Insider Creditors**

The debtor made no payments or transfers to insiders.  Nothing in the record suggests he took any steps to render himself judgment-proof or place assets outside the reach of his creditors at any time, whether before or after the litigation with the Receiver.

**(10)    Procedural Gymnastics to Frustrate Creditors**

The debtor has not engaged in any "procedural gymnastics."  To the contrary, he filed the petition so that one court could resolve any disputes over the dischargeability of his debt, his right to a discharge, or his claim of exemptions.  To the extent anything could be characterized as "procedural gymnastics" it would be the Receiver's effort to challenge the debtor's pension exemption in California.

**(11)    Unfair Use of Bankruptcy Protections**

At its core, the question here is whether the debtor should be able to obtain a discharge of the judgment and his other debts considering his sizeable exempt assets.  The Receiver's argument essentially seeks a judicially-created cap on exempt assets.  Assuming a debtor's desire to protect sizable exempt assets could ever be sufficient for finding bad faith, the court concludes the debtor is not acting in bad faith here.  In light of the debtor's wife's illness and the debtor's inability to find work, they will be required to live off the exempt assets going forward.  The debtor's filing to preserve the exempt assets is not evidence of bad faith.

### Conclusion

For the foregoing reasons, the court will deny the Receiver's motion to dismiss.  A separate order will follow.

cc:    All creditors and parties in interest

### End of Memorandum of Decision

16